Carole LIEBERMAN, Dr.,
Plaintiff–Appellant,

v.

Geoffrey N. FIEGER; Fieger, Fieger & Schwartz, Defendants–Appellees.

No. 01–56401.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 2, 2003.

Filed Aug. 11, 2003.

Paul S. Zimmerman and Howard S. Rosen; Law Offices of Rosen and Zimmerman; Woodland Hills, CA, for the appellant.

William S. Davis and Erik L. Jackson; Arter & Hadden, LLP; Los Angeles, CA, for the appellee.

Before THOMAS, PAEZ, Circuit Judges, and REED, District Judge.*

**OPINION**

THOMAS, Circuit Judge.

Dr. Carole Lieberman appeals the dismissal of her complaint for defamation, fraud, and intentional infliction of emotional distress. We affirm.

**I**

In March 1995, Scott Amedure revealed his secret crush on Jonathan Schmitz on the Jenny Jones show. Three days later, after finding a suggestive note on his door, Schmitz purchased a shotgun and killed Amedure. In a highly publicized trial, the defense team primarily argued diminished capacity, and the jury found Schmitz guilty of second degree murder rather than first degree murder. At a subsequent hearing to determine reimbursement from the county for expenses, defense attorney James Burdick argued that Lieberman's expert witness testimony played an important role in the jury's determination that Schmitz lacked specific intent and thus was not guilty of first degree murder. The court denied the request to authorize funding, including $24,512 for Dr. Lieberman.

In preparation for the subsequent wrongful death suit brought against Schmitz and the Jenny Jones show by Amedure's family, Geoffrey Fieger's firm contacted Lieberman, who had substantial contact with Schmitz during preparations for the criminal trial. Fieger's firm paid Lieberman $2,500 as a retainer and forwarded numerous transcripts and video tapes for her review. Lieberman claims that Fieger retained her as an expert witness and agreed to compensate her for additional services beyond the actual deposition. Fieger denies making this agreement.

Lieberman also claims that after her deposition on March 16, 1999, one of the attorneys from Fieger's firm warned her not to testify before receiving full payment for her work to date. On March 18, therefore, Lieberman submitted a bill for $22,600, covering 54.75 hours of record review and 1.75 hours of consulting, including the deposition itself. After Fieger requested a more detailed breakdown of expenses, Lieberman submitted a handwritten estimate of specific times on March 23 and advised Fieger that she was "not willing to make plans to testify" until she had been paid in full. Fieger then declined to pay the bill. On April 8, Lieberman's attorney demanded payment in full and warned Fieger that Lieberman might be forced to accept offers to provide expert commentary on the Amedure case from various media outlets.

Lieberman filed suit for breach of contract and fraud on April 13 and, shortly thereafter, issued a press release entitled "Psychiatrist Sues Fieger for Fraud ... Calls for Boycott of the Jenny Jones Show!" The press release mentioned Lieberman's upcoming book on the Amedure case and provided contact numbers.

On April 15, during an interview with Court TV (which was broadcasting the Amedure trial), a reporter asked Fieger about the Lieberman lawsuit. Fieger responded that he had already told Lieberman that "under no circumstances" would he allow her to testify. He added that

---

* The Honorable Edward C. Reed, Jr., United States District Judge for the District of Neva-da, sitting by designation.

Burdick, Schmitz's original defense attorney, had told him "in no uncertain terms" that Lieberman was "mentally unbalanced" and "a terrible witness who was disliked by the jury." Fieger cited Lieberman's upcoming book and accused her of hunting publicity, stating: "this thing is being broadcast world-wide and it brings out the Looney Tunes. And this is one of the Looney Tunes." He added that "in the criminal case, she had the audacity to submit a bill of $100,000," but the court "laughed at her and gave her zero." He concluded by stating that the description "of the nuts growing on trees" in California was "not that far off." Four days later, Lieberman amended her complaint to include claims for slander and intentional infliction of emotional distress.

Fieger removed the case to federal district court, which granted summary judgment to Fieger on the fraud, slander and emotional distress claims. The court found that the general context of Fieger's remarks reflected an animated exchange within a contentious legal conflict and that any specific expressions merely displayed colorful, figurative rhetoric. Because the comments could not be proven true or false, the court concluded that they were non-defamatory as a matter of law. The court also dismissed Lieberman's fraud claim based on the failure to provide any evidence of fraudulent intent. Shortly thereafter, the parties settled the outstanding breach of contract claim, and this appeal followed.

## II

California has traditionally treated defamatory statements made on television broadcasts under the rubric of slander. *Arno v. Stewart*, 245 Cal.App.2d 955, 961, 54 Cal.Rptr. 392 (1966); Cal. Civ.Code § 46; *but see Polygram Records, Inc. v. Superior Court*, 170 Cal.App.3d 543, 551 n. 9, 216 Cal.Rptr. 252 (1985) (questioning continued vitality of categorization). In California, slander is defined by statute.[1] However, "[t]he First Amendment places limits on the types of speech that may give rise to a defamation action under state law." *Gilbrook v. City of Westminster*, 177 F.3d 839, 861 (9th Cir.1999) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 14–21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)). Among other protections, the First Amendment shields "statements of opinion on matters of public concern that do not contain or imply a provable factual assertion." *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir.1995).

The central question in this case is whether the allegedly defamatory statements made by Fieger were constitutionally protected opinions. In making that assessment, the threshold question is "whether a reasonable factfinder could conclude that the contested statement implies an assertion of objective fact." *Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir.1995) (internal quotation, citation and ellipsis omitted.). "If the answer is no, the claim is foreclosed by the First Amendment." *Id.* "To determine whether a

---

1. "Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime; 2. Imputes in him the present existence of an infectious, contagious, or loathsome disease; 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; 4. Imputes to him impotence or a want of chastity; or 5. Which, by natural consequence, causes actual damage." Cal. Civ.Code § 46 (2003).

statement implies a factual assertion, we examine the totality of the circumstances in which it was made." *Underwager*, 69 F.3d at 366. In conducting this inquiry we examine:

> (1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates that impression, and (3) whether the statement in question is susceptible of being proved true or false.

*Partington*, 56 F.3d at 1153(citing *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir.1990)).

In applying these factors, the district court examined the broad context, including the "general tenor of the work," and found that the immediate dispute grew out of a larger legal battle which had already attracted a great deal of public and media attention. The court noted that Fieger had just been served with the suit in the courthouse, that the interview was designed to get his reactions to issues relating to the trial, and that Fieger had just engaged in a heated exchange with the Court TV personnel about the nature of the coverage.

The district court then properly considered the specific context and content of the allegedly defamatory statements in order to analyze "the extent of figurative or hyperbolic language used and the reasonable expectations of the audience." *Underwager*, 69 F.3d at 366. The court determined that no reasonable viewer would have taken as factual Fieger's colorful expressions, such as "Looney Tunes," "crazy," and "nuts." Similarly, the court found that a reasonable viewer would have perceived the phrase "mentally imbalanced" in this context, as part of a stream of a rhetoric.

Finally, the court asked whether any of the statements were "sufficiently factual to be susceptible of being proved true or false." *Id.* The court correctly concluded that none of the remarks contained verifiable assertions and cited numerous cases holding that similar epithets were not provable as false.

We agree with the district court's thorough analysis. These allegedly defamatory statements constituted an expression of opinion, constitutionally-protected by the First Amendment.

In her briefs before this Court, Lieberman also claims that several statements by Fieger were explicit factual assertions capable of being disproven, namely: (1) an incorrect statement as to the amount of the bill she submitted; (2) an inaccurate statement that the trial judge had "laughed" at her fee request; and (3) a false claim that she was a "terrible witness disliked by the jury" in the criminal case. The primary difficulty with Lieberman's assertion is that she did not base her slander claim on any of these statements.[2] Thus, the district court cannot be faulted for not analyzing them.

■ Further, even if we were to construe Lieberman's complaint so broadly as to embrace these statements, her claim is still not actionable. Fieger's misstatement of the amount of fees Lieberman actually sought is not actionable because it is de-

---

**2.** Lieberman's slander claim against Fieger provides that: "Specifically, **FIEGER** claimed to have been informed that **PLAINTIFF**, a licensed California Psychiatrist, was 'mentally unbalanced,' claimed that **PLAINTIFF** was 'crazy,' was 'a Looney Tune,' was the subject of ridicule by a court pertaining to her expert testimony in a case, was a 'nut growing on trees' in California and had improperly charged money to **FFS** for a retainer." (emphasis in original). Her complaint neither contained allegations based on an inaccurate statement of the bill she tendered, nor upon Fieger's representation of Burdick's statement.

void of defamatory meaning. Defamatory statements must not only be false and unprivileged to constitute slander, but they must have a "natural tendency to injure" or cause special damage. *Ringler Assoc. Inc. v. Md. Cas. Co.*, 80 Cal.App.4th 1165, 1179, 96 Cal.Rptr.2d 136 (2000). Even if factually untrue, Lieberman must show that Fieger's mistaken reference to the amount of the bill she sent had a tendency to expose Lieberman to "hatred, contempt, ridicule, or obloquy," or injury in her occupation. *Copp v. Paxton*, 45 Cal.App.4th 829, 839, 52 Cal.Rptr.2d 831 (1996). Lieberman failed to demonstrate any such defamatory meaning, and the allegedly inaccurate statement as to the amount of the bill thus cannot sustain a slander claim.

 Lieberman's other two examples of "explicit" factual assertions made by Fieger are equally unavailing because they constitute protected opinion. Fieger's statement that the criminal court "laughed at her and gave her zero" merely offers a hyperbolic and colorful description of the actual outcome: the court denied the request for expert witness fees. *See Ferlauto v. Hamsher*, 74 Cal.App.4th 1394, 1403, 88 Cal.Rptr.2d 843 (1999) (holding that statements that the judge "laughed at their motion" and "thought their motion was a joke" merely provided "colorful descriptions of the incontestable fact that the court indeed denied [the] motion."). In Lieberman's case, as in *Ferlauto*, "[a]lthough the judge may not have literally laughed, authors are not limited to a sterile narrative of facts." *Id.* Similarly, Lieberman cannot recover for Fieger's statement repeating Burdick's opinion that "she was a terrible witness disliked by the jury." The literal statement made by Fieger had factual support. Indeed, Burdick later reiterated this opinion before the district court and was sued by Lieberman for making the statement. Nonetheless, the salient issue is whether Burdick's original statement was actionable. *See, e.g.,*

*Flowers v. Carville*, 310 F.3d 1118, 1129 (9th Cir.2002) ("[A] defamatory statement isn't rendered nondefamatory merely because it relies on another defamatory statement."). In this case, Burdick's opinion of Lieberman's performance was a "statement[ ] of personal viewpoint, not [an] assertion[ ] of objective fact." *Partington*, 56 F.3d at 1153. Thus, it falls under the protection of the First Amendment, as does Fieger's subsequent repetition of the same statement.

Lieberman also argues that the district court misconstrued both the general and specific context of Fieger's remarks because the audience was not aware of the larger legal context. She claims that the audience did not see Fieger served with the complaint and was not really aware of the larger context of their legal dispute. She also argues that Fieger appeared calm and dispassionate throughout the conversation, "interspersing his attack on Lieberman with a disquisition on Michigan law."

However, careful examination of the video tape and transcript do not support her claims. Immediately prior to the discussion of Lieberman, Fieger accused Court TV of biased coverage. After noting that "you remind us of that from time to time," the reporter switched subjects and continued, "I want to ask you about another issue that deals with what you're holding in your hand: a complaint filed against you two days ago by a potential witness, Carole Lieberman.... " She then asked Fieger for his "reaction." After several other comments, Fieger glanced down at the papers and proclaimed incredulously, "she even claims, I see, in a press release, that she owns certain phrases that I used in my opening statement." He continued with a few choice remarks about publicity-seeking "crazy people" and "Looney Tunes" and then confidently boasted that he would "see her in court." From this information,

it is impossible to conclude, as Lieberman suggests, that viewers would not know of the legal controversy. A reasonable viewer would know that Lieberman and Fieger were locked in a legal dispute, that Lieberman had issued a press release about some aspect of it, and that Fieger was hotly disputing the claims. In short, the district court appropriately considered this dispute in its proper context.

### III

For all of these reasons, we conclude that the district court properly dismissed Lieberman's slander claims. We affirm the judgment of the district court in its entirety.[3]

**AFFIRMED.**

---

**3.** The district court also properly dismissed Lieberman's claim for intentional infliction of emotional distress. Under California law, a plaintiff may not maintain an independent cause of action for the intentional infliction of emotional distress based on the same acts which were insufficient to support a cause of action for defamation. *Flynn v. Higham,* 149 Cal.App.3d 677, 681, 197 Cal.Rptr. 145 (1983). *See also Leidholdt v. L.F.P., Inc.,* 860 F.2d 890, 893 n. 4 (9th Cir.1988). Lieberman also claims that Fieger committed fraud by contracting for her expert witness services with no intention to pay her. The district court dismissed the claim after finding that Lieberman failed to present any evidence that Fieger intended to deceive her. On appeal, Lieberman argues that the district court improperly weighed the evidence she presented rather than drawing all inferences in her favor as it was obliged to do in a summary judgment motion. However, a careful examination of the record indicates that the district court drew the appropriate inferences and made a correct application of law to the undisputed facts.